UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

―――――

MAURICE EDWARDS,          )
                                   )
             Plaintiff,        )     Case No. 1:09-cv-1067
                                   )
v.                              )     Honorable Paul L. Maloney
                                 )
GRAND RAPIDS COMMUNITY  )
COLLEGE,                   )     **REPORT AND RECOMMENDATION**
                                 )
            Defendant.     )
_____)

        This is a civil action alleging wrongful termination of plaintiff's employment by defendant Grand Rapids Community College (GRCC). Plaintiff's first amended complaint, filed by counsel, alleged claims against GRCC under Title VII of the Civil Rights Act of 1964 (count 1), 42 U.S.C. § 1981 (count 2), intentional infliction of emotional distress (count 3), procedural due process under 42 U.S.C. § 1983 (count 4), equal protection under 42 U.S.C. § 1983 (count 5), and violation of right to privacy (count 6). By order entered March 29, 2010, Chief Judge Paul Maloney dismissed counts 2, 3, and 6 of the amended complaint with prejudice. Plaintiff's Title VII claim for race discrimination and his section 1983 claims for due process and equal protection violations remain pending.

        After the close of discovery, defendant filed two separate motions for summary judgment.[1] The first motion seeks summary judgment on plaintiff's due process claims (Motion,

―――――――――――――――――

[1] Defendant's decision to file separate motions for summary judgment and supporting briefs is objectionable on a number of grounds. It is apparently an attempt to evade the page restriction for briefs established by W.D. Mich. LCivR 7.2(b). More importantly, this method of briefing the issues

docket # 58). The second motion seeks summary judgment on plaintiff's claims for race discrimination under both Title VII and the Equal Protection Clause (Motion, docket # 64). After each motion was fully briefed, Judge Maloney referred the summary judgment motions to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b). I conducted a hearing on the motions on December 2, 2010. For the reasons set forth below, I recommend that defendant's motion for summary judgment on the due process claim be granted but that its motion for judgment on the race discrimination claims be denied.

### Applicable Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.[2] FED. R. CIV. P. 56(a); *Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see Cady v. Arenac County*, 574 F.3d 334, 339 (6th Cir. 2009). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party

results in the scattering of relevant passages of the same deposition across six separate briefs, rendering the task of finding pertinent passages extremely difficult. If one of counsel's jobs is to assist the court, defense counsel has failed rather markedly.

[2] "The standard for granting summary judgment remains unchanged" under the amendments to Rule 56 that went into effect on December 1, 2010. *See* FED. R. CIV. P. 56 advisory committee note (2010 amendments).

opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. *See Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see LaQuinta Corp. v. Heartland Properties, LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

### Findings of Undisputed Facts

The following is a recitation of the relevant background facts, with all disputed issues resolved in favor of plaintiff. Further evidence relevant to the summary judgment motions is developed in the Discussion section below.

Plaintiff, Maurice Edwards, is an African-American man. He was hired by GRCC in 1997 as a custodian. At the times relevant to the present dispute, plaintiff was assigned to the Spectrum Theater, one of GRCC's facilities in Grand Rapids. Before his termination from employment on May 7, 2008, plaintiff had not been subjected to any major discipline by GRCC.

At all relevant times, the GRCC custodial staff was under the ultimate supervision of Tom Smith, Executive Facilities Director. (Smith Dep., 11-12). In early 2008, Mr. Smith called Lieutenant Harold Woolworth of the Campus Police to report rumors that someone was sleeping at night in the Spectrum Theater. (Woolworth Dep., 11). At Smith's request, Woolworth installed a covert surveillance camera on February 24, 2008. The camera was installed in the "green room," which held a couch. (*Id.*, 14-16). On Friday, February 29, plaintiff was videotaped while lying on the couch for a period of hours during his work shift. Woolworth showed the video to Smith during the next week. (Smith Dep., 115). Smith did not discuss the matter with plaintiff, but decided to give him the "benefit of the doubt." (*Id.*, 118-19). He approved plaintiff's timecard for the period that included February 29, despite his knowledge that plaintiff had not worked the whole shift. (*Id.*, 128-29).

Around March 25, 2008, Lt. Woolworth gave Smith a police report documenting that plaintiff Maurice Edwards had been videotaped lying on the couch on two other occasions, for a total of three. (February 29, March 22, and March 23, 2008). (Report, docket # 59-1, at ID#s 456-57). Lt. Woolworth gave Smith a copy of the videotape, which showed that plaintiff had been lying on the couch for a total of approximately twelve hours during his work period on the three days recorded.

Smith decided to report these incidents to the GRCC Human Resources Department. He provided the HR Department with the police report and drafted a letter to plaintiff placing him on five-day non-paid suspension as a sanction for the sleeping incidents. (Smith Dep., 149). The draft letter was dated May 1, 2008, and represented Smith's proposal for discipline. When he went to the HR Department with the letter, however, he was told that the matter was being pursued not as a sleeping incident but as fabrication of a time sheet. (*Id.*, 153).

Three members of the Human Resources Department worked on the pre-termination process: Faye Davis, a Human Resources generalist; Kathy Keating, Executive Director for Labor Relations; and Cynthia Springer, Vice-President for Organizational Development. (Keating Dep., 122-23). They performed an internal investigation, which included review of the videotapes and collecting the allegedly falsified time records. (Davis Dep., 66-67). They did not, however, speak to plaintiff or otherwise inform him of the investigation. (Davis Dep., 71-72, 74-75). Ms. Davis prepared a corrective action notice, which stated that the basis for the notice was plaintiff's "sleeping and nonperformance of your custodial responsibilities and falsification of your time sheet on three different occasions during your scheduled work shift at the Spectrum Theater." Ms. Davis placed an "X" in the box for "termination." (docket # 60-2, Def. Ex. G, ID# 503). Ms. Davis conceded that she prepared the termination notice without speaking to plaintiff to hear his version of events. On May 6, 2008, at 4:58 p.m., Ms. Springer sent an e-mail (docket # 77-1 at ID# 819) to Dr. Olivarez, who was then President of GRCC. The e-mail informed Dr. Olivarez that plaintiff would be terminated the next day and included a draft notice to the Board of Trustees announcing the action. (Springer Dep., 27-29). The notice was written in the past tense and stated that plaintiff "was

terminated" on May 8, 2008, for "sleeping on the job and falsification of time sheets." (docket # 77-2 at ID# 820).

On the next day, May 7, 2008, plaintiff and his union representative Lorraine Fortuna met with Davis and Smith in the offices of the GRCC Human Resources Department. Plaintiff and Ms. Fortuna testified that they had no previous notice of the meeting. (Edwards Dep., 233-34; Fortuna Dep., 14-17, 37-39). Defendant contends that Davis notified plaintiff orally the day before concerning the purpose of the meeting. (Davis Dep., 75-76, 94-95). For purposes of summary judgment, the court must accept plaintiff's version that he received only thirty minutes' notice of the meeting and was not told of its purpose. Plaintiff and his union representative were given the draft corrective action notice and were offered an opportunity to review it. Ms. Davis gave plaintiff an opportunity to respond to the allegations concerning his sleeping on the job and falsifying payroll records. Plaintiff did not respond, although he was given a chance to do so. (Fortuna Dep., 21, 26, 44-46). Ms. Davis told plaintiff that he was terminated at the end of the meeting.

Plaintiff and his union pursued the grievance process through the third of five steps. During this process, plaintiff was represented both by union representatives and their attorney. It is undisputed that plaintiff never denied sleeping on the job during the administrative process. The union did not pursue the grievance beyond level 3.

On December 30, 2008, plaintiff filed an administrative charge with the EEOC, alleging that he had been treated more harshly than white custodians who had slept on the job. The EEOC issued a right-to-sue letter on September 15, 2009. (docket # 1 at ID# 11). Plaintiff initiated this civil action on November 20, 2009, by filing a *pro se* complaint alleging race discrimination.

Thereafter, counsel entered an appearance for plaintiff and filed an amended complaint. (docket # 25).

Plaintiff's due process claim is predicated on the lack of meaningful notice before his termination. The Title VII and equal protection claims are based on the assertion that white custodians who were found sleeping on the job were treated more leniently than was plaintiff.

## Discussion

### I. Procedural Due Process

Count 4 of the complaint is brought against defendant GRCC under 42 U.S.C. § 1983, alleging that defendant deprived plaintiff of procedural due process in connection with the decision to terminate his employment. When a public employee has a protected property interest in continued employment, the public employer may not terminate that interest without due process of law. In the public employment context, the Due Process Clause generally requires a pre-termination hearing. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). "A tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546. Defendant does not contest that plaintiff had a protectible interest in continued public employment. Therefore, the due-process claim revolves around the adequacy of the procedures afforded plaintiff before his termination. In this regard, plaintiff asserts that he was not given "meaningful notice" before the May 7, 2008 termination hearing. Furthermore, he contends that the decision to terminate his employment had already been made before the hearing, which was a meaningless formality.

Defendant's motion for summary judgment raises two broad attacks on plaintiff's procedural due-process claim. First, defendant asserts that the process it afforded plaintiff was adequate in the circumstances of the case, taking into consideration the relatively simple nature of the charges against him, the full opportunity that he had to respond to those charges at the May 7 hearing, and the panoply of post-deprivation rights available to plaintiff under the collective bargaining agreement. Second, defendant asserts that, regardless of the adequacy of the procedures afforded to plaintiff, he has failed to establish grounds for holding GRCC responsible for the omissions of its employees. Because GRCC is clearly entitled to judgment on the second ground, it is unnecessary to explore the close question of the adequacy of the process afforded to plaintiff in connection with his termination.

To establish a claim under 42 U.S.C. § 1983, a plaintiff must satisfy two elements: (1) that there was a deprivation of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of state law. *See Wittstock v. Mark A. VanSile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). Municipal corporations are considered to be "persons" for purposes of section 1983. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). A municipality, however, "cannot be held liable *solely* because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under section 1983 on a *respondeat superior* theory." *Id.* Rather, a plaintiff asserting a section 1983 claim against a municipal corporation, such as a school board, "must show that the School Board *itself* is the wrongdoer." *Doe v. Claiborne County Bd. of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996) (citations omitted). That is, municipal liability under section 1983 is limited to deprivations of federally protected rights caused by action taken "pursuant to official municipal policy of some nature." *Monell*, 436 U.S. at 691. The "official

policy" requirement of *Monell* was intended to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembauer v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986).

Michigan community colleges, such as GRCC, are created pursuant to provisions of the Michigan Constitution. MICH. CONST. 1963, art. VIII, § 7. The legislation authorizing establishment of community colleges is the Community College Act of 1966. MICH. COMP. LAWS §§ 389.1-.195. The Community College Act specifically provides that community colleges are corporate entities. MICH. COMP. LAWS § 389.103. Consequently, the Sixth Circuit holds that a community college may not be held responsible in a civil rights action brought pursuant to 42 U.S.C. § 1983 on a *respondeat superior* theory, but that the requirements of *Monell* for municipal liability must be satisfied. *See, e.g., Chonich v. Wayne County Cmty. College*, 874 F.2d 359, 366-67 (6th Cir. 1989); *accord Leahy v. Bd. of Trustees of Cmty. College Dist. No. 508*, 912 F.2d 917, 922 (7th Cir. 1990) (applying *Monell* to claim against community college). Therefore, to succeed on his section 1983 claim against the community college, plaintiff must demonstrate *both* the existence of an official custom or policy *and* "a direct causal link" between the policy and the alleged constitutional violation. *See Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009).

The record in the present case is devoid of evidence that GRCC caused the deprivation of plaintiff's due-process rights in any of the ways recognized by the federal courts. Plaintiff can point to no action by the GRCC Board requiring inadequate notice or a perfunctory hearing in connection with termination of employment. Further, plaintiff's argument is that his employment was terminated by Tom Smith, the Executive Facilities Director. Defendant argues that

employees of the Human Resources Department made the final decision. No one argues that the decision was made by the President of the college or any other person with "final decision-making authority." *See Pembauer v. City of Cincinnati*, 475 U.S. 469 (1986). Plaintiff has not pleaded or proved that the persons making the decision to terminate him were inadequately trained or supervised, nor has plaintiff identified an official custom or policy of the college that was the proximate cause of a due-process violation.

To the contrary, plaintiff argues that the procedures used in this case *violated* clearly established college policy. Plaintiff's brief asserts that the college had an invariable policy requiring advance notice to the employee of any contemplated termination of employment, and that the college had never deviated from this policy before doing so in plaintiff's case.

> Defendant GRCC had a custom and practice in place regarding notice of an allegation and an opportunity to respond to the allegations before a decision was made to terminate. According to Cynthia Springer the "chief human resources officer" and the person who developed policies and procedures for the Defendant, the policy was to create an investigative file upon receipt of the allegations, inform themselves of the allegations and provide the employee with an opportunity to respond before a decision to terminate. Exhibit 3. Ms. Davis, a human resources generalist also testified to those same facts -- receipt of complaint, human resources educating itself about allegation, contacting employee to give them an opportunity to respond before a decision to terminate. Even conducting an "interview." Exhibit 2. Ms. Davis testified that she had never witnessed any prior deviation from the custom or practice. *Id.* According to the chief human resources officer "I would have obviously wanted to be <u>assured</u> that the supervisor is involved and is working with the employee, to you know, clarify the facts that might go into or lead to that decision." (Exh. 3, pp. 26-27, Ins. 23-25, 1-2) That was her expectation based on GRCC's custom and practices. Unfortunately, that custom and practice was not accorded Maurice Edwards.

(Plf. Brief, docket # 74, at 19-20) (footnote omitted).

Under settled Supreme Court authority, a municipal corporation is liable for a constitutional deprivation only when enforcement of its policy, customs or practices was the

-10-

"moving force" behind the violation of plaintiff's rights. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 400 (1997). In the present case, plaintiff has neither pleaded nor proven a basis for municipal liability. In fact, plaintiff's own arguments negate any finding that the due-process violation was caused by a college policy, custom, or practice. Plaintiff essentially seeks to impose vicarious liability on GRCC for the acts and omissions of its supervisory employees, which plaintiff concedes were unprecedented and contrary to official policy. GRCC is therefore entitled to summary judgment on plaintiff's claim under 42 U.S.C. § 1983 for deprivation of property without due process.

## II.     Race Discrimination Claims

Plaintiff contends that he was terminated on account of his race. Count 1 alleges a claim under Title VII of the Civil Rights Act of 1964. Count 5 asserts an equal protection claim pursuant to 42 U.S.C. § 1983.

Where, as here, a Title VII plaintiff does not present direct evidence of racial discrimination, he may attempt to create a presumption of unlawful discrimination by satisfying the requirements of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To create a presumption of discrimination, a plaintiff must prove a *prima facie* case by establishing that (1) he was a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the position; and (4) for the same or similar conduct, he was treated differently from similarly situated employees who were not in the protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802. If plaintiff presents sufficient evidence to create a triable issue on each element of the *prima facie* case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory

reason for its action. The ultimate burden of persuasion rests with the plaintiff to prove that the proffered reasons were a pretext for discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). Plaintiff's equal protection claim under section 1983 for discrimination on account of race by a public employer requires proof of intentional discrimination. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988). Proving intentional discrimination for an equal protection claim brought under section 1983 requires the plaintiff to make the same showing required to prove a violation of Title VII. *Id.* at 1325. Therefore, "the shifting evidentiary burdens set out in the leading Title VII cases of *McDonnell Douglas* and *Burdine* are applicable to § 1983 cases." *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1011 (6th Cir. 1987).[3]

A.      Prima Facie Case

For purposes of its motion for summary judgment, defendant does not contest the first three elements of a *prima facie* case, namely, that plaintiff is a member of a protected class, that he was subject to the adverse employment action of termination, and that he was qualified for his position. Defendant strenuously asserts, however, that plaintiff has failed to show that he was treated differently from similarly situated white employees for the same or similar conduct.

To compare the plaintiff's treatment to that of non-minority employees, plaintiff must show that he and the employees were similarly situated in all "relevant" respects. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). In general, to be deemed

_____

[3] To prevail against a municipal defendant, such as GRCC, in an equal protection claim under section 1983, plaintiff is required to show grounds for municipal liability under *Monell*, as well as intentional discrimination. GRCC did not, however, include this ground in its motion for summary judgment directed to plaintiff's race discrimination claims. Therefore, the adequacy of plaintiff's proofs to establish municipal liability on the equal protection claim is not before the court.

-12-

similarly situated, the employees with whom plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct "'without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Plaintiff, however, need not demonstrate an exact correlation with the employee receiving more favorable treatment. *Id.* at 414.

In attempting to establish this aspect of his *prima facie* case, plaintiff relies principally on the testimony of Daniel Babcock, a retired supervisory employee of GRCC. Babcock was promoted to Assistant Director of Facilities for GRCC in 2001, in which capacity he supervised the custodians. (Babcock Aff., ¶¶ 7, 9, ID# 713). From 2001 through his retirement in 2005, Babcock reported directly to Tom Smith (*Id.*, ¶¶ 8, 10). In his affidavit, Babcock avers that during his fifteen years at GRCC, there were numerous instances of custodians who were caught sleeping on duty and in all cases, progressive discipline was applied. (*Id.*, ¶¶ 19-20). Babcock was not aware of a single custodian who was terminated for sleeping on the job. Rather, he alleges that during his tenure, the offending custodian was informed of the violation and was afforded an opportunity to make up the time. (*Id.*, ¶¶ 21-23). This general information is insufficient to establish a *prima facie* case, precisely because this general testimony does not establish that any of the "numerous" other custodians found sleeping on the job were similarly situated with plaintiff.[4]

---

[4] Such testimony could be relevant at trial on the ultimate issue of discrimination, but it is too vague to establish the fourth element of a *prima facie* case.

Babcock did, however, testify concerning the treatment accorded specific custodians found sleeping on the job. Plaintiff relies on the treatment accorded two white custodians -- John Roy and Jason Natte -- in support of plaintiff's *prima facie* case. Babcock testified that John Roy was caught sleeping "25, 30, 40 times" during the time that Babcock was Assistant Director of Facilities reporting to Tom Smith. (Babcock Dep., 114-15). Babcock talked to Roy and "wrote him up," ultimately turning the matter over to Smith. (*Id.*, 115). Babcock testified that Roy was a diabetic and that Smith said to just "leave him alone," and that Smith would take care of it. (*Id.*). "It was one of those things where if I took it to Smith, he really didn't want to deal with it." (*Id.*). When Roy was confronted, he blamed the medicine that he was taking for his diabetes and for a heart condition. (*Id.*, 116-17). Babcock testified that Smith counseled Roy often but that Smith decided "not to do much." (*Id.*, 117). Roy was never disciplined. (*Id.*, 147).

Babcock also testified that Jason Natte was also found sleeping on the job. (Babcock Dep., 137-38). Natte was given the chance to present his side of the story, and presented information concerning his own medical condition and that of a child that was causing him to lose sleep. (*Id.*, 138-39). Natte was never disciplined. Smith testified that Babcock made him aware of Natte's sleeping on the job after it had been occurring for an extended period of time. (Smith Dep., 29). At some point, however, Babcock informed Smith that Natte had a sleeping disorder and asked Smith how the situation should be pursued. (*Id.*, 29-30). By that time, Smith had learned of Natte's sleeping through another source, David Emelander. (*Id.*, 31). When Babcock asked for direction, Smith asked him why Natte was sleeping on the job. (*Id.*, 31-32). Smith did not refer Natte to the HR Department for discipline, but allowed Babcock to handle the situation.

On the face of things, both Roy and Natte appear to be suitable comparables for plaintiff, sufficient to at least raise a triable issue of fact as to whether they were treated differently from plaintiff for the same or similar conduct. On the question whether plaintiff and his comparables were subject to the same supervisor, the Sixth Circuit often looks beyond the immediate supervisor to determine whether the employees' situations were handled by the same "ultimate" supervisor. *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005); *accord, Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 481 (6th Cir. 2008). The present record clearly supports a finding that plaintiff, Roy and Natte were all under the ultimate supervision of Tom Smith. Both Natte and Roy were white, both were found sleeping on the job (apparently many more times than plaintiff was), both presented time records falsely claiming compensation for time spent working, and both were custodians for GRCC. Neither Natte nor Roy was disciplined in any way, while plaintiff was terminated from employment.

Defendant nevertheless argues that Natte and Roy cannot be deemed comparable employees, because they were not similarly situated with plaintiff. In pressing this argument, defendant attempts to minimize the fact that all three employees were subject to the ultimate supervision of Tom Smith, that Tom Smith was contemporaneously aware of the sleeping infractions by each employee (being informed by Babcock of Roy's situation, by both Babcock and Emelander of Natte's situation, and by the campus police of plaintiff's situation) and that Tom Smith chose to report plaintiff to the HR Department for discipline but did not institute discipline against the white employees. Defendant further attempts to defeat this element of plaintiff's *prima facie* case by the repeated assertion that Smith did not terminate plaintiff, but that the ultimate decision was made by Cynthia Springer, an African American woman, who was the Chief Human Resources Officer.

Defendant supports this argument with the following questions and answers from the Springer deposition:

> Q.    Who makes the final decision?
> A.    To terminate employees at GRCC?
> Q.    Yes.
> A.    Myself.

(Springer Dep., 18).  Only if these two questions and answers are read in a vacuum could one conclude that they are sufficient to negate the existence of a triable issue of fact concerning the decision to terminate plaintiff's employment.  A review of Springer's testimony as a whole shows that it is confused and internally inconsistent.  A reasonable trier of fact could easily conclude that the effective decision to terminate is made by the department manager and that the HR Department guides, approves and executes that decision:

> Q.    Okay.  How about discipline; what function did the HR department also play in terms of discipline of custodians?
> A.    Again, human resources is a support function in an advisory capacity.  We have specific responsibilities for investigating around disciplinary situations that arise.
> Q.    Okay.
> A.    But that's done, again, in collaboration with the hiring departments, the operating departments.
> Q.    And, finally, termination; who makes the decision to terminate a custodian?
> A.    HR is both the advisory around terminations to management and the -- we execute, deliver terminations on behalf of the Institution.
> Q.    Meaning you deliver the news?
> A.    We are involved in making sure the news is delivered.  And in some instances, we are the messenger, and in some instances we are the support in the room when the conversation is had.
> Q.    Who makes the final decision?
> A.    To terminate an employee at GRCC?
> Q.    Yes.
> A.    Myself.
> Q.    Does the line department manager have a say in that?
> A.    Absolutely.  Absolutely.  We are a support function, so our role is to support and provide guidance.  And that guidance can be on behalf of the institution,

the guidance can be on behalf of the line department, and that guidance can be on behalf of the employee. We are multiple hats. And so our role is to really navigate decisions so that they are sound decisions, thorough decisions, et cetera.

Q. Okay. Can -- and this is just a hypothetical. Can the human resources department terminate an employee against the wishes of the line manager?

A. HR is not going to go in and terminate an employee without involving the line management.

Q. Okay. Is there a specific policy or rationale behind that?

A. Not that I'm aware of.

Q. Okay. But you need the line manager's input?

A. Yeah. Employees report to departments. So from that perspective, they are the employees of that organi -- that department organization. And HR is going to be your resource to help ensure that there's consistency and that there is an application of policies that is within -- in line with the policy.

Q. Okay.

A. Yeah, but that's consultation and guidance.

(Springer Dep., 17-19).

Defendant downplays Smith's role in all three personnel decisions. For Natte and Roy, defendant argues that Babcock made all decisions. For plaintiff, GRCC argues that three employees of the HR Department alone decided to terminate plaintiff. But the proofs are susceptible to a different conclusion. On the present record, a reasonable trier of fact could easily conclude that Tom Smith was the moving party behind plaintiff's termination, that the concurrence of the HR Department was necessary, but that plaintiff's employment would not have been terminated over Smith's objection. The record supports a conclusion that Smith, the ultimate supervisor, was contemporaneously aware of Roy and Natte's misbehavior, and that he failed to take action in response to repeated sleeping incidents (and concomitant falsification of time records) by Roy and Natte, but reported plaintiff to the HR Department for discipline without even discussing the matter with plaintiff or attempting to determine the cause of the problem before referring him for discipline. Smith clearly had discretion to report misconduct by his employees to the HR Department, or not.

(Keating Dep., 81-82, 127-29). In plaintiff's case, he chose to report it, which led to plaintiff's termination. In the case of Natte and Roy, he chose not to. This evidence is sufficient to establish the fourth element of plaintiff's *prima facie* case.

In summary, a reasonable jury could find on the present record that plaintiff's supervisor, Tom Smith, chose to subject him to serious discipline for sleeping on the job and falsifying time records, but chose not to discipline in any way two white employees who were guilty of the same or worse misconduct. I therefore find that plaintiff has satisfied the elements of a *prima facie* case under both Title VII and the Equal Protection Clause.

B.        <u>Legitimate Non-Discriminatory Reason</u>

Once a plaintiff makes a *prima facie* showing, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Reeves*, 530 U.S. at 142. This burden is one of production, not persuasion. Therefore, it can involve no credibility assessment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). In the present case, defendant asserts that the decision to terminate plaintiff was based on his falsification of time records, in which he certified that he was working when in fact he was asleep. GRCC asserts that this conduct violated the "zero tolerance" provisions of a conflict-of-interest policy adopted in September of 2005. The policy itemized certain acts of misconduct which "constitute grounds for immediate termination," including "falsification of payroll records." As the 2005 conflict-of-interest policy had not been in effect during the sleeping incidents involving Roy and Natte, GRCC argues that it has met its burden of producing a legitimate, non-discriminatory reason for termination.

Plaintiff does not and cannot dispute that GRCC adopted a policy in 2005 that allowed termination of employment as a consequence of falsification of records. Therefore, defendant has met its burden by offering admissible evidence sufficient for the trier of fact to conclude that plaintiff was fired because of his presentation of false attendance records. *See Reeves*, 530 U.S. at 142. The burden then shifts back to plaintiff to produce evidence raising a triable issue of fact that the legitimate reason offered by the defendant was not its true reason, but was a pretext for discrimination. *Id.* at 143. Pretext may be established by showing that the proffered reason had no basis in fact, did not actually motivate the actions, or was insufficient to motivate the actions. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).

The record in this case, viewed in a light most favorable to plaintiff, is sufficient to raise a triable issue of fact on the question of pretext. The GRCC policy does not *require* termination from employment, but merely *authorizes* it. Even in the case of falsification of time records, the "facts and circumstances" would dictate whether an employee would be terminated. (Keating Dep., 113-14, 132-33). This is demonstrated by defendant's own proofs, which show that GRCC has applied the policy five times to custodians since 2005, and that it chose to terminate the employee only three of the five times. (Def. Brief, docket # 64, at 5). Furthermore, an employee would have been subject to termination for falsification of time records under the former 1991 policy. (Keating Dep., 132-33). Hence, a jury could find that the 2005 policy did not require or compel plaintiff's termination and that discipline remained discretionary, just as it had under the 1991 policy, when Roy and Natte committed their misconduct. In light of this evidence, a jury could find that the 2005 "zero tolerance" policy was nevertheless discretionary and "did not motivate"

GRCC's termination decision.  *See Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009).

The discretionary nature of GRCC's policy serves to distinguish this case from the unpublished decision, *Cartwright v. Lockheed Martin Util. Srvs.*, 40 F. App'x 147 (6th Cir. 2002), upon which GRCC relies.  In *Cartwright*, the employer had a "zero tolerance" policy requiring dismissal of an employee found sleeping, if two witnesses saw the employee sleeping.  40 F. App'x at 156.  Two witnesses saw plaintiff sleeping, and he was therefore discharged.  "There was evidence that white employees, including a white supervisor, were fired for sleeping on the job.  At the same time, there was no evidence that the company's witness requirement -- that there be more than one witness to a sleeping incident before an employee may be discharged -- was pretext for discrimination."  *Id.* at 156.  If GRCC's proofs were equivalent, that is, if they showed an invariable policy that removed all discretion and required termination, then reliance on that policy could entitle GRCC to summary judgment.  GRCC's policy, however, did not dictate any particular result.

Finally, GRCC argues that plaintiff's evidence on the issue of pretext must include direct evidence that racial animosity, and not the proffered reason for termination, motivated plaintiff's discharge.  It is true that proof that the employer's proffered reason is unpersuasive or insubstantial does not necessarily establish racial discrimination.  *Reeves*, 530 U.S. at 146-47.  The trier of fact, however, is permitted to infer the ultimate fact of discrimination from the falsity of the employer's explanation.  *Id.* at 147.

> The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a *prima facie* case, suffice to show intentional discrimination.  Thus, rejection of the plaintiff's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*St. Mary's Honor Ctr.*, 509 U.S. at 511. Put another way, proof that the defendant's explanation is "unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. GRCC is therefore incorrect in arguing that, to defeat a motion for summary judgment, a plaintiff must adduce direct proof of racial animus to overcome the employer's proffered reason for discrimination. In fact, the Supreme Court has pointedly rejected plaintiff's argument: "It suffices to say that, because a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, the Court of Appeals erred in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149.

Plaintiff has adduced evidence sufficient to create a *prima facie* case. Further, he has produced evidence, which, if believed by the trier of fact, would allow a finding that his termination was not required by the "zero tolerance" policy, defendant's proffered reason for termination. The evidence in this case is not so one-sided that defendant must prevail. Therefore, I conclude that defendant is not entitled to a summary judgment on plaintiff's claims under Title VII (count 1) and the Equal Protection Clause (count 5) for race discrimination.

## Recommended Disposition

For the foregoing reasons, I recommend that defendant's motion for summary judgment on plaintiff's due-process claims (docket # 58) be granted, but that defendant's motion for summary judgment on plaintiff's claims of race discrimination (docket # 63) be denied.

Dated: December 21, 2010      /s/ Joseph G. Scoville
                                            United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).